Good morning, your honors. Dennis Reardon for appellant Briana Waters. Can I be heard clearly? Yep, so far. Thank you. There are some issues in this case that are factually complicated, but what we'll now call the Presley issue is pretty simple and straightforward. The first act that the trial judge took upon taking the bench on the first day of trial was to announce that he would use the entire courtroom for the purpose of filling up the veneer and members of the public would be permitted in only if there were seats left over. And I quote, I want those folks to occupy the seats first and then we will see what seats are left. And the court says that's the way it's going to be done. The defense objects on the grounds of, among other things, In re Orange, which is a Sixth Amendment case reversing for failure to make adequate accommodations for the public, where the courtroom was filled with prospective jurors. And the court says, but we're going to proceed in the fashion that I said. And before the jurors are actually brought in, the court is addressing the spectators in the courtroom and says you'll be accommodated the best we can, but we are going to ask you to let the jury be seated first. We'll go through that process. If there are any seats left over after the jury is in those seats, then you're welcome to the seats. And so the court is saying that there will be no consideration of the public's right to attend the jury selection. Rather, it will be entirely subordinated to the court's interest in the convenience of filling the courtroom with prospective jurors. The issue now under Presley is this. It isn't really about numbers, who gets in and who gets out. It's about the application of constitutional principles, whether they're applied or ignored. And the first principle is that the court must take every reasonable measure to permit the spectators into the courtroom, the right of the public to attend a trial. And the second one is that it has to have an overriding interest if it's not going to permit spectators into the courtroom. You didn't argue this in your briefs. Is that right? In the opening brief. That's right, Your Honor. And? Does that present a problem? Your Honor, I would say this. Ask my question and I'll answer yours, too. Go ahead. It's fully preserved at the trial level. Yes, I understand that. The issue is it's preserved there. And let me just make this comment. The government seems to say that it was prejudiced because it wasn't raised in the opening brief, suggesting that the record in the trial court was different. And that makes no sense. That's silly. That doesn't make any sense. But so, quite frankly, I had discussions with trial counsel on this. We had six major issues. And I said, we don't have a case specifically addressing the question of whether permitting veneer people into the courtroom is a sufficiently important interest. Presley reads as if it's just kind of implementing what was already there. Well, yeah, if you look at the dissent from Justices Scalia and Thomas, they make a pretty compelling case that even the petitioner in that case acknowledged that there was a split on the circuits on this, and there was certainly no definitive Supreme Court law. But, yes, we have a definitive Supreme Court opinion. On that basis, we asked this Court to consider an issue that was fully preserved below. All right, but let's get to the point then. The point is that it's now before us. We're going to listen to it at least for argument purposes. You said in your opening remarks, it's not about numbers. Now, as I understand the record, there were, in fact, in Presley, there was one person. That was what was at stake in Presley. As I understand, there were at least three spectators in the courtroom per the record, and there may have been somewhere between 15 and 25 people in the hallway. Is that right? That's what's in the record? Yes, Your Honor. We don't know from the record. We don't know whether or not, as jurors were excused, whether anybody from the hallway was allowed to come in and fill in any empty seats. Is that right? Well, we do know this, Your Honor, because the government has provided us with the voir dire. The statement about three is at the end of the morning session. By that time, the jury selection is virtually complete. The voir dire is complete. Defense counsel gets up on page 98 of the voir dire and says, look, we're again complaining. There's 15 to 25 people outside who were excluded. Apparently, three were let in at the beginning of the process. The prosecutor says, I want a record on that, how many people were excluded, and the defense says, we've talked to security, 25 people were excluded. So, yes, there are a few people admitted. Under the rule, under the so the if let me make a concession, if one person being in the courtroom is enough to honor the public trial right, then we lose this case. However, what the court says in Presley is that you have to do things like open up at least a row or two for the spectators. It says or split the venir in half so that half the courtroom can be used for the public. We can't have a rule that says I want to use this courtroom simply for voir dire, but having read Presley, I'm going to put somebody, one person in here, and then I'll avoid a Presley claim. The issue isn't whether one or two people were in. We can imagine a situation where a judge said, you know, Presley is a pain in the neck. I'll tell you this. Defense counsel, you can have two people in the courtroom for jury selection. Prosecution, you can have two, but I'm going to exclude the rest of the public, even if there's 100 people out there, and the media, because I just need to get around Presley in order to fill up the courtroom with the venir. If we look at Presley, Presley says, no, you have to split the venir in half to open half the courtroom up, or you have to specifically designate rows in front. So the argument here is not that there was no one. There was one person excluded in Presley. Here we have 25 people excluded because it was a case of great public interest. So if we're focusing on which was the greater impingement on the public interest here, it's much greater in this case than in Presley where one person was excluded. The important thing is what constitutional rules were either applied or not applied, and this court made no effort. And the government concedes that the venir people were the priority, and it was such a priority that public members would be allowed in only, only if there were seats available. And not only does that not respect Presley's rule that every, every, every reasonable alternative must be taken, and the court there specifically talks about splitting the venir, but there is no overriding interest in having the courtroom filled with veneer people. You know, you do half the veneer at one point, you do half the veneer at another. No one can possibly say that the interest in having the whole veneer in the courtroom at the same time wholly overrides any consideration of the right to a public trial. The issue is here. The government will. Okay, I think we've got your point on that. Can you turn to the end of the trial and talk about the problems associated with the events of the breaking news about the arson and the post-trial issues? Yes, Your Honor. I'll come back to another issue, but this is the court, so I'm going to deal with the concerns that it wants dealt with as they're raised. Very simply, we would agree, no one would dispute, that if it had been discovered that there was a juror who came in here during deliberations and said to other jurors, you know, there was another arson that went on recently and Breonna Waters has been linked to it, that this conviction would have to be overturned for the impermissible consideration of extrajudicial information under a string of Supreme Court cases from Shepard on through. What we had here was not proof that this extrajudicial information reached the voir dire, but proof that just that information was being widely disseminated in the community in the midst of deliberations. And what the court's obligation was surely was to at least ask, has anyone heard anything about this case this morning? All it said was, I'm not going to ask you whether you've heard anything. I'm just going to ask you whether there's anything that you've heard, whether you've heard it or haven't heard it, that might prejudice you. No, okay, let's get on with business. And this case may be affected by the Skilling case, which was argued in the Supreme Court right now on a venue issue. But can we imagine in a case like Enron, or in this case with a great deal of publicity in this area, if during voir dire a judge said, I don't want to know if you know anything about the case. I don't want to know if you read about it. All I want to know is that if you've read about it, can you be fair? That simply would be a patently inadequate method of determining whether a juror was biased or had information that received outside the courtroom that would affect their judgment. Under this Court's opinion in Silverthorne, the Court in this situation, which posed as great a red flag as imaginable, that there was the danger of the receipt of extrajudicial information during deliberations, had an obligation to, A, if not to do individual voir dire, and I think it did have to do individual voir dire, and simply ask each member directly of the jury whether they had heard anything. It certainly had an obligation to say, is there anyone on this panel who heard anything about the case this morning? And once those hands were raised, then you could proceed to the examination of whether they were likely to be prejudiced by the information. Mr. Reardon, if we were to agree with you on that issue, what's your remedy? Well, there's two parts to this. If you agree with me on that issue, the remedy is a new trial. First of all, is this also tied to your prohibition from interviewing the jurors? Two separate issues, Your Honor. One, the first issue is the issue during deliberations of whether the Court fulfilled its legal duty under this Court's precedent to conduct an adequate examination. If it did not, then the conviction must be reversed. Why? Why can't you just send it back for that inquiry to be made? Well, alternatively, the Court, I suppose, could say, well, no, the proper remedy would have been once the verdict came in, to permit the jurors to be interviewed by counsel pursuant to the local rule, which specifically Or the inquiry, the judicial inquiry to be made. Or both. Or to send it back to say you can interview the jurors and there could be an evidentiary hearing as to what they actually knew at the time. Well, I think that those are, I mean, Silverthorne found an abuse of discretion and found reversible error in the failure to conduct an adequate examination in that situation, Your Honor. I think they're two different claims. I mean, one, if the Court failed its own judicial obligation to investigate properly, I think that we have a prejudicial error. If it were viewed as an overkill, if in fact nobody in fact heard anything. Well, the reason a rule like that needs to be enforced is that if the Court had fulfilled its obligations in that regard, this Court, there either would have been a mistrial or this Court would be deciding the matter on an adequate record. Alternatively, we're in the situation in which we say years afterwards, an inquiry which should have been conducted then will now be conducted in a situation where not only is it much more difficult to either locate jurors, memories are faded. For all we know, they're dead or impossible to locate. So the Court has a tremendous interest in imposing a rule which would obligate a court, as Silverthorne does, to conduct the inquiry at an appropriate time and make an adequate record. Let me turn to one other issue that I think is awfully simple. And the government has a difficult task because it has to defend the indefensible. We have a situation here in which the trial judge took an enormous amount of evidence and over a 403 objection, both relevance and 403, that this was inflammatory and highly prejudicial, ruled it admissible without reading a single page of it. Without getting, well, maybe you can't do it without getting to the merits of the 403 question, but again, what's the remedy? Oh, the remedy is the remedy that this Court ordered en banc in the Curtin case. The remedy is reversal. That did require some looking at the material to determine whether there was, what, a viable 403 argument or a strong 403 argument or what? Well, actually, Curtin is very explicit on this and endorses the Sixth Circuit's opinion in Merriweather. It says here's the procedure. If there's a 403 objection, the burden shifts to the government to justify, and you'll find this in the Curtin opinion citing Merriweather, to justify the admissibility of the evidence in terms of a relevant issue in this case, at which point it is then the obligation of the Court to read every page of the material in order to determine, A, whether it is relevant to that issue, and, B, if it is, whether its probative value is outweighed by its prejudicial effect. Yes, but I'm asking on review. I mean, suppose there was a 403 objection and the judge didn't read anything, but it was PAP. It was nothing anybody would have ever thought was a 403 problem. I assume we're not going to reverse that. So there has to be some inquiry into what's ‑‑ Oh, oh. Yeah, yeah. Well, I didn't mean to suggest that the government, in a situation where there's a 403 argument, I mean issue, can't argue that even if error was committed, that it was harmless. They did that in the Curtin case. And what the Court said in that case is, look, this evidence was so clearly inflammatory that it can't possibly be ruled harmless. So we gladly accept the burden of saying it was 403 error. Here's the harm. The harm is that this Court ruled invisible an argument that Disneyland and Wall Street should be burned down and destroyed without even knowing that it had just permitted the prosecution to elicit that testimony on direct examination of its witness. My understanding is that some material was read into the record, was actually read out loud. Oh, yes, it was read out loud, right. Was it read at the time or read at closing argument or both? No, no, no. The sequence of events is the Court rules all of the ‑‑ in a pretrial hearing the Court rules the entire exhibit admissible. Okay. Then during the examination of witness Kolar, she reads out loud a number of snippets of these exhibits. Then the exhibits go in en masse to the jury, hundreds of pages of them, some of which obviously contain the material that she read and some of which obviously didn't. So your position is that there was no point, you couldn't have re‑raised the 403 issue at that point because it had already been ruled upon. Because at that point the judge did know at least some of what was in the file because he was hearing it. Yes. And in fact, Your Honor, and we've cited to this in the record, defense counsel does say I have a standing objection to this and the judge says it's noted, you know. I mean, I've ruled on this, so it's noted. In this situation, too, why isn't it okay to send it back and tell the district court, well, look at all this material and revisit your 403 ruling? Now suppose the district court does that and says, well, you know, I read all the material, I would still let it all in, or, you know, maybe I made a mistake but it's harmless. Does that cure the problem? Well, Your Honor, I ‑‑ Without a new trial, I mean? I simply would point the court to two things. One was that in Curtin, which is the UNBOC opinion, which is controlling, the court said it's inflammatory material. A new trial is required. And secondly, Ellis specifically dealt with, quote, unquote, anarchist material and again found that it was inflammatory and prejudicial and reversed on that basis. We have a situation in which the prosecutor in closing said, look, this material was important to her because she gave it to Kolar. Now, that's a whole other can of worms because we have Kolar's perjured testimony in that regard as to the chain of custody. But he said, and what is this material? It shows that capitalism must be destroyed. So there is simply no way in a case like this, I mean, this material is filled with things that deal with sexuality. I mean, there were things read in the record, but there were hundreds of other pages in here. There were statements that capitalism must be destroyed. There's a statement that the- We know what's in them. You're getting out of time. Right. So do you want to save any time or just run it out? Well, I do. I'll save one minute, Your Honor, and one final sentence. The unfairness of the ruling on all of the government's 403 material is that the court lets it in without reading any of it and then looks at the defense video and says, I've reviewed this and I'm ruling it out under 403. How could the court rule out the video under 403 saying it wasn't relevant to rebut the government's evidence when the court didn't even know what the government's evidence was? How could it say that video wouldn't have been critical to jurors when they looked at these hundred pages of material when the court didn't even know what was in the hundreds of pages of material that it had sent into the jury room? And with that, Your Honor, I see I have 30 seconds and I'll reserve those. Good morning, Your Honors. My name is Michael McCorkin. I represent the government on this appeal. Counsel has effectively conceded that his Presley claim is waived. He admits that he discussed it with defense counsel. He identified it and elected not to pursue it. He also admits that he was aware there was authority that supported the claim. So I fail to see how failure to raise it in the open brief is not an abject waiver of the claim. But the government doesn't need to hang its hat on the waiver. There simply was no Presley violation here because the courtroom was not closed. Presley involved a court that completely excluded the public. The fact that there was only one spectator in Presley is factually correct, but it's not what the court did. The court would have cleared that courtroom whether there was one or 20 or 50. The court was not allowing anyone in to the jury selection. That is just not what happened here. There was a space concern. The court endeavored to accommodate the veneer on the one hand, the public on the other. It brought in seats so some spectators could get there. How many? From what the record is, from what we know, the court brought in three seats. We do not know whether from the beginning of jury selection to the lunch break, which the blood year transcript now shows us that there were jurors excused prior to the exercise of peremptories. So we know that some seats did open up. We don't know from this record whether or not anyone was allowed in or not because the record was never developed. But the fact is, is that the court did endeavor to accommodate the public. So as just a definite ‑‑ I believe it is, Your Honor, and I would suggest that the rule is if the public is completely excluded, that's obviously a closure. You can have a situation where a portion of the public is excluded. And the court ‑‑ and I would say that differing from the courtroom is full, so the entire public can't come in. A situation where, for example, you allow some spectators, but you ask certain other spectators to leave and there's empty spaces in the courtroom. Especially with modern technology, it's relatively easy and often done to have spillover courtrooms. In other words, to have some TV on and have people sitting down in the hall. I suppose that that is, in some instances, a technological alternative. The question sort of becomes when the issue arises on the day of jury selection, what is the court's obligation? Is the court's obligation to adjourn the matter for a week to set up a technology? Wait a minute. The issue doesn't arise on the day of jury selection. He knew in advance how many jury veneer people he was going to have and how big the courtroom was. He always had some idea because they order an extra large veneer, right? He knew it was a problem case in terms of publicity. We knew it was a problem case in terms of the veneer. So it didn't arise on the day of trial. Not the size of the veneer, but he had no way of knowing how big. Well, he knows it's a case that attracts wide public attention. I mean, that's why he needs a large veneer, right? I agree. The fact that the case had drawn a lot of pretrial publicity is why you would need a large veneer because you want to make sure you can get an impartial jury. It doesn't necessarily mean that you're going to have a courtroom packed with spectators. And he knew that. But what is the... I thought he said that even if we rented the kingdom, we wouldn't be able to seat the people that are interested in this case. I think the court was being hyperbolic in recognizing what this court has recognized is that courtrooms have a finite amount of space. I understand, but that sort of undercuts the notion. He didn't think there would be a lot of people there. Well, what is the purpose, you think, in Pressley in mentioning that, well, one thing you can do is, you know, is sort of bifurcate the voir dire and, you know, bring in the veneer, you know, half of the time. Why do you suppose they mentioned that? I think it's important to understand in Pressley that the court was... there's no way to read Pressley as saying that that is a per se requirement. The court was simply listing various options that a trial judge, who in contrast to this judge, made no effort to accommodate the public. The court was saying, listen, if you're going to exclude the public, you've got to at least consider some measures. What is the point of having a public trial? Courage. I mean, well, there's the public's interest in seeing the proceedings. There's the defendant's interest in ensuring that the proceedings are seen by the public, such that, you know, witnesses will be encouraged to testify truthfully, things of that nature. And that seems to... all those concerns, as well as media and so on, tend to depend on there being some range of people there, not being selective about who's going to be there, because different people do different things. And if you're trying to assure essentially exposure, so if anything goes on untoward, it will be part of the public dialogue. It's a notion that you can do that with one or two people is not really logical. Then the court's going to have to engage in a game of line drawing, 10, 20, 30. How diverse? But that's not really the line drawing. The line drawing is what could have been done to change this. And there are some obvious things that could have been done. Well, respectfully, Your Honor, I would think that's incorrect. The initial inquiry is whether or not the courtroom was closed. There is a distinction in the case law between... It was closed to 25 people. That's not a closure, Your Honor. It's no more closed than if this courtroom was full and there was 25 people in the hallway. No one would say this courtroom is closed. Actually, what we would do, and we do it all the time, is have a spillover viewing area. Well, if we know about it. We have reason to think it's good. In any event, so in this case, on the facts. On the facts. The point that Counsel Mr. Reardon made was that the judge's attitude toward the process was not a Presley attitude. It was because there's no... None of the discussion we're now having took place. There was no discussion about, all right, I have a full veneer. I want them all in the courtroom because I don't want to have to repeat myself. He didn't go through any explanation, did he? He just said, I want everybody in the courtroom and we'll bring in three chairs. Well, that's not quite an accurate characterization of what the judge said. The judge did make clear that he wanted the veneer in the courtroom. He also made clear that whatever seats were available, he would obviously allow the public in. And when there were no seats in the gallery, he went out and got some seats for some of the public. I think that what's important, again, is that leaving aside the fact that Presley simply doesn't apply because the courtroom wasn't closed, and I can't stress that enough, there is a distinction. And I would point this to this Court's case in Sherlock makes clear that space concerns are not a closure. And in Sherlock, that particular case, one of the times when there was inadequate space in the courtroom, was during jury selection, and this Court held that's not a closure. It's a space consideration. Presley involves a situation when the Court excludes anyone. We know the facts. But then getting to the Court's consideration of the alternatives, he considered the alternatives that were presented to him. No one asked him to have technological, you know, to set up an overflow courtroom. So it was sort of the only alternatives that were suggested to him were to bring in spectators in front of the bar, which is just frankly silly, or to get a bigger courtroom. But there wasn't a bigger courtroom. That was what was presented to him, and he did the best he could in that situation. Okay. Why don't you move on to the... Turning to the... Documents or... Well, I'll take the documents first. I think it is important to, in considering Government's Exhibit 614, it's important to consider how the evidentiary objection was raised, and to contrast that with Curtin. Here, the defense moved to exclude the exhibit in toto. Its motion papers are clear on this. Its colloquy with the Court is clear on this. The defense was not concerned that page 168 was inflammatory or page 212 was inflammatory. The defense's concern was that these materials were anarchist. That's bad. They should be excluded. That was the nature of the claim presented to the judge. By the way, you don't contest that the judge didn't review the material, do you? No. In fact, it didn't because it's the defendant's motion, and the defendant didn't bother to provide the materials to him. That's sort of the interesting question about this ruling, is that the defense was asking... Wait a minute. Why did the defendant have to provide it when you're offering it? This was a pretrial motion. It was his motion to exclude. The movement bears the burden. He came in and was asking the Court to exclude these materials. Now he's complaining the judge didn't read them, but he didn't give them to him to read. And there's a very good reason for that. Because, again, the defense was not concerned with individual... My understanding in Curtin was that that was true as well, that they wanted everything out. And, in fact, that was still the issue on unbanked. Should anything have been admitted? And the ultimate conclusion was, well, some of it could have been admitted, but it should have been read. But the motion was a motion to exclude it all. Actually, in Curtin, it was the government's motion. The government was speaking a prospective motion on its admissibility. So there the government did bear the burden. And, in fact, in Curtin, the materials were before the judge, and the judge didn't read all of them. And I agree that in Curtin that that's a problem. I think that the question here is that when the defense is saying... Wait a minute. Just remind me now. This was one of the pretrial motions, right? This was a pretrial motion, yes. And you say the documents were not before the court even at that time. That's correct. They only showed up at the time Kolar was on the stand. No. The court actually had the documents prior to trial. My understanding is that... I'm now looking at a transcript of the hearing where there is... Mr. Fox says there's a lot of material, anarchist-type materials that were in the folder. The government hasn't brought them into court so the court can see them all and for the court to go through and make its own determination as to what's relevant and what's not. Correct. So isn't that exactly what you're asking for? Well, I guess my question is this. The defense is saying the government hasn't brought them in. And, A, I'll note that that's on relevance and not prejudice. But leaving that aside, he's saying the government hasn't brought them in. But the defense isn't saying the record's inadequate for you to make this ruling. The defense continues to urge the wholesale exclusion. They're saying and so the court can't go through and make its own determination as to what's relevant and what's not. No. But then if you read on, the next nine pages or so, the defense is arguing for the wholesale exclusion of those documents  That's the defense's argument. What was the government's reason for or basis for omitting these to begin with? Well, there's twofold. First of all, there's the envelope in which the documents are contained. Sure. So that means you omit the envelope. Then why? Well, right. But the documents are important for two reasons. One, it obviously shows the connection between Waters and Kohler, one of our co-conspirators. It also goes to evidence of motive because that they share the same sort of conspiratorial aim. And importantly, it directly rebuts the defense that I am a non-violent activist. I don't believe in violence. How does she do that? Excuse me? The fact that she has a bunch of articles about this, how does that prove what she believes? When she's giving these articles to Kohler saying you should read this, this is, you know. You should read it to show what you shouldn't believe. No. Actually, I think the record reflects that it's, you know, this is sort of what we're about. And I think that's a fair characterization of Kohler's testimony about why these documents were given to her. Here's some stuff to read that I was telling you about. Period. That's all it says. I think you have to view that in context of their relationship. I mean, and that, but again, I think it's relevant. It's also the content of those articles. Now, they're members of the Earth Liberation Front. Some of those articles are about the Earth Liberation Front. That's clearly relevant to show why would Waters, if she is purportedly not associated with these folks, be giving articles, which, by the way, actually included articles about this very arson, to a co-conspirator? If for no other reason than it's probative of, that she finds this sort of material acceptable. And I would even point out that Waters told the New York Times that she agrees with this type of activity. So it's directly relevant to rebut the defense, the defense that I'm a nonviolent person. And this Court's decision in Geis makes that point clear. The reason that, in the opposition to the motion, what the government actually said was, first of all, that it shows that she's connected to Kohler, which we understand, but that's just a folder. And then, second, the fact that it contains an article discussing this arson means that she may have been pro of the fact that she's involved in this crime. Now, assuming that could be relevant, that was a minuscule amount of what was in this file, right? The question of the Center for Urban Horticulture Arson article. That was a single page. Yes, that's correct. And at the same time, the judge didn't have this stuff when he ruled on it. And for all he knew, that's, in fact, what was in this file. But, in fact, most of what was in the file was not that. Well, and, of course, that begs the question that, because at the pretrial ruling, at the pretrial conference, the Court made clear that the defense was free, if circumstances changed, to revisit the rulings. That begs the question of why, when the materials offered, the defense didn't renew an objection that, okay, well, now we've got a whole bunch of materials that we think are just really bad. It's also, I think, with respect to the admission of these documents, to recognize it, as Curtin said, as Curtin realized, assuming it was a mistake, it can be subject to harmless error analysis. And that's dispositive here, because the content of these folders, the most inflammatory stuff about burning down Disneyland, which has been the center focus of the defense since the beginning of trial, that was on the Elf Out website that was admitted without objection. Most of the documents that were retrieved from Solon's home largely mirrored some of these anarchist materials. Again, materials admitted without objection. So this material was already out there, and it admitted this is essentially duplicative of the content. So the idea that the subject matter was going to inflame the jury, I fail to see how these documents versus the other documents would have accomplished that. And I think that the jury's verdict shows they weren't inflamed. And the jury, if the jury was inflamed, they certainly would have convicted her on the destructive device count. There was no logical way not to convict her of that, having convicted her of the arson. They were obviously showing her some mercy. So the idea that there was any prejudice to the jury's deliberation by this material is refuted by the record. Why not pass the jury? And speaking of flame, why don't you get to it? Yes. With respect to the Woodinville fire, I think it's important to note that the premise that there was no doubt that any of these jurors were exposed to this is a questionable one at best. Well, but that's why you have an inquiry. The Court did inquire. No, it didn't. He never asked anybody whether they actually saw anything. The Court did truncate the inquiry. I would also point out, though, and I would direct the Court to pages, let's see, it's basically three through five of the record where defense counsel is sort of suggesting how he would like the Court to address the jury, and the Court's ultimate inquiry, which is on page 11 of the record, largely mirrors what the defense asked was that there was a news story. Has it affected you and your ability to deliberate? And that's basically what the judge asked. The judge didn't ask, okay, he didn't make it a two-part inquiry. Did you, are you aware of this story? If so, will it affect your ability to deliberate? He simply asked, said, there have been some stories. Is there any, you know, have any of you been exposed to anything that will affect your deliberations? Something along those lines. And no juror responded affirmatively. The first step was largely irrelevant. It was sort of assumed that there was this material out there. Has anyone been exposed to anything that will affect their ability to deliberate? Is it Silverthorne directly on point and not complied with here? I would disagree because of the nature of the publicity. The Court's precedents after Silverthorne make clear that, look, if it's crystal clear that there's just been, you know, an overwhelming amount of publicity that's happened since the deliberations, an individual inquiry might be required. But the Court's precedents also make clear that if that's not certain, if there's some, you know, if it's not just you just can't reach any other conclusion, then you are permitted to address the panel as a whole and then follow up with anyone who may respond affirmatively. And that was what was complied with here. And individual inquiry in this context seemed to me would be an overkill. Once everyone said, you know, we can deliberate fairly, are we supposed to then inquire of them individually? It just seemed to highlight the problem. It's not exactly what they said. Nobody was asked to do anything other than raise a hand. Well, I think it was they were asked. As if there was a question that said, can you, anybody, A, has anybody been exposed to these materials? And as counsel suggested, if anybody had affirmatively responded to that, then the question you're suggesting could have been asked and answered. Correct. You could have said, I, Brenham, I can be fair. Right. Okay? But in this case, when you said, the Court, just very quickly, just let me read it, any of you now heard anything about this, the news story, that you cannot set aside, would it influence your deliberations here? Anybody heard anything that would be different than the instructions I've given you as to what the evidence are and what you are to decide this case? Very clearly asked, had anyone heard anything that was going to, didn't ask, did you hear the story, yes or no? Did you hear the story? And if you did, is it going to affect your deliberations? And nobody said anything. There was no reason to follow up at that point. Thank you, Your Honor. What about, just finally, the connected issue of the post-verdict prohibition on talking to the jurors in the face of a local rule that allows talking to jurors when there's a hung jury, which there was here? Well, there's a, very quickly, I have a procedural response, which was that it was raised too late. It was raised, that issue was raised in a motion for reconsideration, which was untimely and denied on procedural grounds. On the merits, the Court has the authority to preclude this. Whether or not it complied with a local rule, I think in the exercise of its supervisory power, it could certainly, under this Court's precedent, just bar it. So whether or not there was strict compliance with the local rule, I don't, I think it's sort of a red herring. The Court has the authority to preclude this sort of inquiry, and the Court did so. And the local rule is meaningless? I'm not saying the local rule is meaningless. The local, I think a judge could say, okay, well, if this is the local rule, but in this instance, I find that I'm going to. He didn't say that. Well, the judge could say that. Maybe he could, but he didn't say that. Well, that may be, Your Honor. And had counsel brought this attention to the Court in a timely fashion. What do you mean? The counsel has to call the Court? You know, I mean, just right off the bat, he, you know, the Court says, you know, don't talk to the jury now. The jury, I don't want you to talk to the lawyers. I mean, there was no, I mean, you know. Well, I would agree that, technically speaking, since they were hung on some counts and not hung on others, there's a, it's arguable that the local rule. Arguable? I think it's plain. Okay. I'm not 100% sure of that just because the hung jury thing could be read to say hung in the entire trial or hung on one. You could imagine a case where there's 20 counts and they hang on one. That would, it seemed to defeat the purpose of the local rule to allow inquiry of the jurors in that narrow circumstance. But I think what's important is by the time the local rule issue is raised, the government has made clear they're not going to retry Ms. Waters barring reversal on appeal, so there's no need for any inquiry. Because the whole point was, is that the counsel made very clear, that's the other thing, what they wanted this for. They wanted to ask the jurors what was going on in their deliberations. You're not allowed to do that. That's just impermissible. So it was naked why the court was seeking, or why counsel was seeking to do this. It was for an improper purpose, and for that reason. You can ask them, you know, what went on in deliberations in the sense of, well, you know, did extraneous material include into your deliberations. You could ask. And this is a case, you know, right for that extraneous inclusion because of the publicity that happened around that time. I would respectfully disagree with that because the jurors all made clear on the record that none of that had effect, none of them had been exposed to anything that was affecting their deliberations. They were seeking, basically defense was seeking to impeach their representations to the court. Scalia, we don't know what they would have said if they were followed up individually, do we? I don't think there was any need to since no one, everyone affirmed that they had been exposed to nothing that was going to affect their deliberations. Again, they're simply seeking to impeach the jurors' representations to the court. That is impermissible. Okay. Thank you. I will be brief. This Court is going to write an opinion interpreting Presley. We ask that the Court write an opinion that says Presley says you have to take every reasonable measure to accommodate the public. The government says we want you to write an opinion that says if a judge puts one person in the courtroom, Presley has no relevance or significance, there is no public trial right beyond admitting one person. It could be a relative of the prosecutor, for all we know. It could be someone associated with the prosecution side or an alleged victim. No one else has any right to get in. As long as the government lets, the judge lets one person in, that's nonsense. Secondly, on the option that the Court suggested of having an open courtroom with video, it's a very common practice. Judge Ilston was going to do it in the Bonds case. The government's response is no one suggested it. Presley could not be clearer. That one thing that it enunciates very clearly is that the Court must consider all options, irrespective of whether they are presented to it by counsel. On a rule, they are asking you to overrule Curtin, which says on a 403 objection, the Court reads every page of the material. The government's rule is that on a 403 objection, if the defense finds all of it offensive and objects to all of it, then the Court says, well, then I'm not going to read it. I'm not going to read anything. Now, if you objected to two pages, I'd read them. But if you object to the whole thing, I don't have to read them. That's nonsense under Curtin. One point that should be mentioned on the local rule is that the prosecutor misquoted the rule to the Court, and the Court misquoted the rule in making its ruling because it said the local rules don't permit interviews of jurors, and both of them left out the section that said, except, of course, in the instance of a mistrial. And the government's reading of Rule 606 of the Evidence Code is nonsense. What 606 says is that you may not put into evidence the mental state of jurors. Therefore, you can't get into evidence that I convicted because of X, Y, or Z. 606 could not be more explicit that you can get into evidence by interviewing jurors, evidence that extrajudicial material entered into jury deliberations. That was precisely the focus of the inquiry here. They didn't want to find out in the abstract what affected jurors. They wanted to know if the extrajudicial material of these news reports had entered into the jury process. And, of course, 606 has no application when the request was first made because it was made before the verdict. 606 talks about impeaching verdicts. So at the time of the deliberations, there was no evidentiary bar for the Court inquiring as to what went on in the jury room in terms of extrajudicial information. Thank you very much, Your Honor. Thank you. Thank you, counsel. We appreciate the arguments. The case is submitted and will be in adjournment or recess, whatever the term may be.
judges: Tashima, Fisher, Berzon